**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

U.S. FILTER/JWI, INC.,
a Michigan corporation,
Plaintiff,

Case No.:
Hon.

-vs-

J-PARTS, L.L.C., a Michigan
limited liability company, and
MICHAEL GETHIN, an individual

Defendants.

5:03CV0127

David W. McKeague
U.S. District Judge

Robert J. Franzinger (P25539)
Lori M. Silsbury (P39501)
Thomas M. Schehr (P54391)
Adam B. Strauss (P53319)
DYKEMA GOSSETT PLLC
Attorneys for Plaintiff
400 Renaissance Center
Detroit, Michigan  48243(313) 568-6690

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff U.S. Filter/JWI, Inc., by its attorneys Dykema Gossett PLLC, states as follows

for its Complaint against J-Parts, L.L.C. and Michael Gethin:

### NATURE AND SUMMARY OF ACTION

1.      This is an action by the established market leader in the manufacture and sale of

industrial dewatering equipment.  Through this action Plaintiff seeks redress for a scheme by one

of its former trusted employees, and a company he formed for such purpose, to misappropriate

significant aspects of the value of Plaintiff's business, including Plaintiff's trademarks, trade

secrets and other proprietary information.  The misappropriated information had been entrusted

to the employee in reliance on promises he made in contracts governing his employment and his

fiduciary duties under law to use the information solely for purposes of his employment for Plaintiff.

2. Among other things, while still employed by Plaintiff, the employee downloaded voluminous and highly valuable confidential information from Plaintiff's computer system and is using that information and other of Plaintiff's trade secrets and confidential information to compete directly against Plaintiff for sales of spare parts for its equipment. Adding insult to injury, Defendants have adopted and are using corporate and business names that are confusingly similar to Plaintiff's trademarks, which actions were calculated to and have caused customers to falsely believe that Defendants are associated with Plaintiff's well-established business.

3. Plaintiff seeks preliminary and permanent injunctive relief prohibiting Defendants from continuing their unlawful scheme, including their infringement of Plaintiff's trademarks and misappropriation of Plaintiff's trade secrets. Plaintiff also seeks damages and other appropriate relief to compensate Plaintiff for the injury that Defendants have caused through their unlawful actions.

## PARTIES AND JURISDICTION

4. Plaintiff U.S. Filter/JWI, Inc. ("USF/JWI") is a Michigan corporation with its principal place of business located in this judicial district in Holland, Michigan.

5. Defendant J-Parts, L.L.C. ("J-Parts") is a Michigan limited liability company with its principal place of business located in this judicial district at 12764 Greenly, Suite 20, Holland, Michigan 49424.

6. Defendant Michael Gethin ("Gethin") is an individual who resides in this judicial district in West Olive, Michigan.

7. The Court has jurisdiction under 15 U.S.C. § 1121 and 28 U.S.C. § 1338(a) because this case arises under the Trademark Laws of the United States, 15 U.S.C. § 1051 *et seq.*

The Court has jurisdiction of certain of the unfair competition claims herein under the provisions of 28 U.S.C. § 1338(b) in that said claims are joined with a substantial and related claim under the Trademark Laws of the United States, 15 U.S.C. § 1051 *et seq.*

8.     The Court has jurisdiction over plaintiff's state-law claims, including USF/JWI's claims under Michigan's Uniform Trade Secrets Act, MCL § 445.1901 *et seq.*, and for breach of contract, pursuant to 28 U.S.C. § 1367.

9.     Venue is proper in this Judicial District under 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

### HISTORY OF U.S. FILTER/JWI'S BUSINESS

10.     Plaintiff was incorporated and began operations in the late 1970s as a Michigan corporation named JWI, Inc. The corporation was founded to pursue the novel business concept of selling filter presses to industrial and commercial customers to enable them to comply with then newly-promulgated environmental regulations mandating the pretreatment of industrial waste water streams.  The name "JWI" was derived from the first and middle initials of its founder, John William Vanden Bos.

11.     In November 1997 Plaintiff's corporate name was changed to its present name, "U.S. Filter/JWI, Inc." [For ease of reference Plaintiff, for the periods both before and after the 1997 corporate name change, will hereinafter be referred to as "USF/JWI"]

12.     USF/JWI has been engaged continuously in the business of marketing, manufacturing and selling filter presses and other dewatering equipment for more than 25 years. For much of that period, USF/JWI has marketed products under a variety of names beginning with the prefix "J-", including such names as J-PRESS® filter presses and J-MATE® sludge dryers.

3

13.    USF/JWI has been for many years, and continues to be, the market leader in the sale of filter presses, sludge dryers, and other dewatering equipment. As testament to the success of USF/JWI's sales and marketing efforts and the value of its trademarks, there are more than 7600 J-PRESS® filter presses and more than 800 J-MATE® dryers operating in the field today. These products are installed and operating on five continents and in more than forty countries.

USF/JWI'S TRADEMARKS

14.    At least since 1981, USF/JWI has used the mark J-PRESS® and is currently using that trademark with respect to the marketing and sale of filter presses and spare parts for such equipment, to distinguish the products from the goods and services of others.

15.    USF/JWI adopted the mark J-PRESS® for the marketing and sale of filter presses and spare parts for such equipment. On September 28, 1982, USF/JWI filed an application for registration of the mark J-PRESS® in the United States Patent and Trademark Office. On November 29, 1983, this mark was registered in the United States Patent and Trademark Office on the Principal Register under the Act of 1946, as Registration No. 1,259,184, covering the use of the mark on presses for extracting solids from slurry material. A printout from the United States Patent and Trademark Office, Trademark Electronic Search System (TESS) for this registration is attached as Exhibit A.

16.    USF/JWI has filed with the United States Patent and Trademark Office an affidavit of use of the mark J-PRESS® as required by 15 U.S.C. § 1058(a), and the registration for J-PRESS® is presently valid.

17.    The validity of the registered mark J-PRESS® and of the registration for this mark, USF/JWI's ownership of the mark, and USF/JWI's exclusive right to use this registered mark in commerce for the above-mentioned goods are incontestable under 15 U.S.C. § 1065, and

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

15 U.S.C. § 1115(b), as USF/JWI has filed the required affidavit with the Commissioner of Patents and Trademarks.

18.    Continuously since at least November 20, 1981, USF/JWI has used the mark J-PRESS® to identify its filter presses and spare parts for such equipment and to distinguish them from those made and sold by others by, among other things, prominently displaying the mark J-PRESS® on the goods and advertising associated therewith.

19.    At least since 1985, USF/JWI has used the trademark J-MATE® and is currently using that trademark with respect to the marketing and sale of sludge dryers and spare parts for such equipment to distinguish the products from the goods and services of others.

20.    USF/JWI adopted the mark J-MATE® for the marketing and sale of sludge dryers and spare parts for such equipment. On June 10, 1985, USF/JWI filed an application for registration of the mark J-MATE® in the United States Patent and Trademark Office. On February 25, 1986, this mark was registered in the United States Patent and Trademark Office on the Principal Register under the Act of 1946, as Registration No. 1,384,160, covering the use of the mark on units for sludge reduction and drying by the application of heat. A printout from the United States Patent and Trademark Office, Trademark Electronic Search System (TESS) for this registration is attached as Exhibit B.

21.    USF/JWI has filed with the United States Patent and Trademark Office an affidavit of use of the mark J-MATE® as required by 15 U.S.C. § 1058(a), and the registration for J-MATE® is presently valid.

22.    The validity of the registered mark J-MATE® and of the registration for this mark, USF/JWI's ownership of the mark, and USF/JWI's exclusive right to use this registered mark in commerce for the above-mentioned goods are incontestable under 15 U.S.C. § 1065, and

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

15 U.S.C. § 1115(b), as USF/JWI has filed the required affidavit with the Commissioner of Patents and Trademarks.

23.    Continuously since at least May 17, 1985, USF/JWI has used the mark J-MATE® to identify its sludge dryers and spare parts for such equipment and to distinguish them from those made and sold by others, by, among other things, prominently displaying the mark J-MATE® on the goods and advertising associated therewith.

24.    At least since 1997 USF/JWI has used the mark J-VAP® and is currently using that mark with respect to the marketing and sale of a hybrid of the J-PRESS® filter press and spare parts for such equipment to distinguish the products from the goods and services of others.

25.    USF/JWI adopted the mark J-VAP® for the marketing and sale of a hybrid of the J-PRESS® filter press and spare parts for such equipment. On May 2, 1996, USF/JWI filed an application for registration of the mark J-VAP® in the United States Patent and Trademark Office. On November 18, 1997, this mark was registered in the United States Patent and Trademark Office on the Principal Register under the Act of 1946, as Registration No. 2,114,763, covering the use of the mark on liquid-solid separating/drying machines. A printout from the United States Patent and Trademark Office, Trademark Electronic Search System (TESS) for this registration is attached as Exhibit C.

26.    USF/JWI has prominently displayed the trademarks J-PRESS®, J-MATE®, J-VAP® (collectively "Trademarks") on advertising brochures and other materials promoting its products.

27.    As a result of USF/JWI's promotion and marketing efforts, and the quality of USF/JWI's Products, the Trademarks are widely and favorably known. The Trademarks have become a valuable asset of USF/JWI and a symbol of USF/JWI's goodwill.

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

28.     Due to USF/JWI's exclusive prior and continuous use, the Trademarks have become the exclusive property of USF/JWI.  Further, such use has caused the Trademarks and the prefix "J-" to acquire a meaning exclusively identified with USF/JWI's products and serves to distinguish the services from the goods and services of others.

29.     Since the issuance of the federal registrations, USF/JWI has consistently marked its advertising brochures and other materials with notice of its federal registrations.

### USF/JWI'S SPARE PARTS BUSINESS AND ITS TRADE SECRETS AND OTHER CONFIDENTIAL INFORMATION RELATING TO SUCH BUSINESS

30.     J-PRESS® filter presses, J-MATE® and J-VAP® dryers, and other USF/JWI dewatering equipment normally operate in the field for many years.  They also incorporate components (*e.g.*, filter cloths and gaskets) that wear out in normal operation and must be replaced in routine maintenance.  Given such factors and the large quantity of USF/JWI dewatering equipment operating in the field, there has been and continues to be a substantial market for the sale of spare parts for USF/JWI dewatering equipment.

31.     As a significant part of its business operations, USF/JWI has, since its inception, continuously marketed and sold spare and/or replacement parts (collectively hereinafter "spare parts") for its dewatering equipment.  Illustratively, in 2002 alone, USF/JWI filled more than 5,000 spare parts orders placed by its customers.

32.     The spare parts sold by USF/JWI consist of two general types.  One type, sometimes referred to as "consumables," consists of parts that wear out in normal operation and must be replaced periodically as part of routine maintenance.  Examples of consumables are filter cloths and gaskets for the J-PRESS® filter presses.  The second type consists of components that require replacement because they have failed or worn out over time for a variety

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

of reasons. An example of the latter type would be a heating element for a J-MATE® dryer that has burned-out in normal or extraordinary use.

33. Rapid and precisely accurate response to particularized customer orders and needs for service parts is critical to success in the spare parts business in which USF/JWI is engaged. Illustratively, a failure of a filter press component may render that press inoperable until the correct replacement part is delivered and installed. An inoperable filter press in turn may require a customer to shut down all affected operations -- even an entire plant -- to avoid violation of environmental laws. Spare parts customers in such circumstances need and demand delivery of the right part in the shortest possible timeframe.

34. As evidence of the critical importance of speed in meeting customer needs for spare parts, approximately eighty percent of USF/JWI's orders are designated for delivery on the day following the day the order was received.

35. Over the many years that it has been in business, U.S. Filter has made an enormous investment of its capital, time, effort and expertise to enable it to meet the business challenge of providing rapid and precisely accurate response to particularized customer needs for service parts. One of the most important and valuable assets that USF/JWI has developed through such investment is its "Enterprise Resource Planning" or "ERP" System.

36. The ERP System and the data and information that it contains are important and valuable assets that are used by USF/JWI in the marketing and sale of spare parts for the J-PRESS® filter presses, J-MATE® and J-VAP® dryers, and other USF/JWI dewatering equipment operating in the field and provide USF/JWI with significant competitive advantages.

37. Among other things, the ERP System database contains an enormous quantity of customer information that is valuable to USF/JWI in its spare parts business and would be

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

8

valuable to a competitor that does not have such information.  Such information includes, but is not limited to, the following data:

      a.       Each customer's name and address;

      b.       The name, telephone number, facsimile number and electronic mail address of the key contact person for such customer; and

      c.       Customer classifications that are valuable for targeted marketing and many other purposes.

38.    The ERP database also includes a detailed "serial history" for each of the more than 8,000 items of USF/JWI dewatering equipment in the field.  The serial history is critical to the ability of anyone to ensure that customers get the right spare parts as quickly as they demand and require them.  The serial history, in combination with other information in the ERP System or which USF/JWI otherwise possesses, enables the quick and accurate response customers demand because it contains a detailed and specific identification of each piece of dewatering equipment the particular end-user has in its facility and detailed information about every spare part that the customer has ordered dating back to the installation of its equipment.  The serial history usually enables USF/JWI customer service representatives to identify accurately the part that the customer needs (from a universe of more than 17,000 parts), in a matter of seconds.  Without such information the same task may take hours or even days and is very likely to be impossible.

39.    The ERP System  also includes particularized pricing and margins for each of the more than 17,000 spare parts sold by USF/JWI.  Such information would be extremely valuable to a competitor because it would, among other things, enable the competitor to undercut USF/JWI's prices selectively and by targeted percentages.

40. The ERP System also includes detailed information about USF/JWI's vendors and sources for each of the spare parts it sells, including critically important cross-references between the USF/JWI part numbers that might be found on equipment in the field and vendor part numbers or other identifying information necessary to obtain the correct part from the vendor.

41. The above-described and other hard-earned knowledge USF/JWI has gained over the many years it has been in the spare parts business ("USF/JWI Proprietary Information") gives USF/JWI a significant competitive advantage in the business of selling spare parts for its dewatering equipment. The USF/JWI Proprietary Information took many years to develop and is continually evolving.

42. The USF/JWI Proprietary Information derives actual and potential independent economic value from not being generally known to, and not being readily ascertainable through proper means by, competitors and other persons who could obtain economic value from its disclosure or use.

43. Confidentiality of the USF/JWI Proprietary Information is important to the success of USF/JWI's business. The ERP System data and other USF/JWI Proprietary Information has been treated, at all times, as confidential at USF/JWI and the company has undertaken substantial measures that are reasonable under the circumstances to maintain its secrecy.

44. One of the measures taken by USF/JWI to protect the ERP System is obtaining written promises in confidentiality agreements from employees who are given access to USF/JWI's confidential, proprietary, and trade secret information. At all times material to this action, the making of such promises in writing has been a necessary condition of employment for

10

persons in positions in USF/JWI's organization that are afforded access to USF/JWI's trade secrets and other confidential and proprietary information.

45.     In addition, access to the USF/JWI Proprietary Information is restricted within the company on a need to know basis.

46.     Through the efforts of USF/JWI, USF/JWI Proprietary Information consists of and includes a substantial body of trade secrets and other confidential and proprietary information. Such efforts and the USF/JWI Proprietary Information they have produced have played a significant role in making USF/JWI the recognized leader in the business of selling spare parts for USF/JWI dewatering equipment.

GETHIN'S DUTIES AT USF/JWI

47.     Gethin was employed by USF/JWI for approximately 14 years.

48.     From May 30, 1989, until his voluntary resignation from USF/JWI on July 10, 2003, Gethin served in the position of as a Customer Service Representative ("CSR") for spare parts at USF/JWI's main office in Holland, Michigan. Gethin and one other Customer Service Representative were the primary persons who interacted with customers about spare parts for USF/JWI dewatering equipment.

49.     Gethin's duties as CSR included (a) communicating with customers about their spare parts needs; (b) identifying the correct part(s) required to meet such needs; (c) quoting prices to the customer (including having discretion to negotiate prices within designated parameters); (d) preparing the required order for the spare part; and (e) either arranging for shipment of the part from USF/JWI's inventory or communicating with the purchasing department to ensure that arrangements were made to obtain the correct part from the proper vendor.

11

50. In addition to the above, Gethin's duties as a CSR included supporting USF/JWI's sales and marketing efforts to increase its spare parts sales. Accordingly, during 2002, Gethin was appointed and served as Team Leader of USF/JWI's Aftermarket Product Team ("APT"). The APT represented an effort by USF/JWI to direct the collective wisdom of a number of areas of the company involved in the spare parts business to improving the company's marketing and sale of spare parts. In addition to Team Leader Gethin, the APT included representatives of USF/JWI's purchasing, marketing, engineering and information technology departments.

51. One aspect of the APT's deliberations involved an effort to design a catchy name identified with the strong J-PRESS®, J-MATE®, J-VAP® and other "J-" brand names to be used in marketing the company's spare parts. In the course of these deliberations, the collective group, including Gethin, suggested utilizing "J-Parts," a combination of USF/JWI's well-established "J-" prefix and the word "Parts."

USF/JWI'S DISCLOSURE OF ITS TRADE SECRETS AND OTHER
CONFIDENTIAL INFORMATION TO GETHIN SUBJECT TO HIS DUTY
NOT TO USE SUCH INFORMATION FOR, OR DISCLOSE IT TO, ANY COMPETITOR

52. As a condition of his employment and, in particular, his employment as a CSR, Gethin was required to execute a Confidentiality and Development Agreement, a copy of which is attached hereto as Exhibit D. Paragraph 2 of that agreement provides as follows:

> Non-disclosure and Non-Use of Confidential Information. You shall not, directly or indirectly, disclose to any third party or use Confidential Information, other than in connection with your employment duties for the Company, unless such disclosure or use is specifically consented to in writing by an officer of the Company. Your obligations of non-disclosure and non-use shall continue following the termination of your employment with the Company, except that it will not continue following such termination with respect to Confidential Information which is or becomes generally known to the public or is generally disclosed to third parties through no action on your part.

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

53. Gethin's Confidentiality and Development Agreement defines "Confidential Information" to include the following:

> all trade secrets and proprietary information, including, without limitation, Developments, reports, analyses, financial information, plans, proposals, processes, sketches, photographs, graphs, software, **databases (including, without limitation, customer relationship and management databases)**, drawings, specifications, equipment, samples, **customer lists, supplier and vendor lists, and information relating to costs, pricing, profits, markets, sales, products,** market studies and forecasts, **pricing policies and data,** sales plans, **customers and customer prospects, opportunities, and buying patterns,** business plans, competitive analyses, **agreements with customers, suppliers, vendors,** and others, marketing and dealership agreements, and servicing and training programs and arrangements.

(Emphasis added).

54. Gethin's Confidentiality and Development Agreement further required him to return all of USF/JWI's Proprietary Information upon termination of his employment:

> Records; Delivery Upon Termination. All records, papers, drawings, pictures, computer information, and other tangible documentation relating to the business or activities of the Companies, whether in hardcopy or electronic format, and whether or not prepared or made by you, are property of the Companies. You will immediately deliver to the Company any such property in your possession or under your control upon termination of your employment or earlier if you are directed to do so by Company management. In particular and without limitation, at the termination of employment you will immediately deliver to the Company all such materials in your possession or under your control containing or relating to Confidential Information or Developments.

55. During his employment, as appropriate to his duties and in reliance on Gethin's continued promises (see Exhibit D) and his obligations under law, Gethin was given access to and received a substantial amount of USF/JWI Proprietary Information that constituted Confidential Information within the meaning of Gethin's Confidentiality and Development Agreement.

13

## GETHIN'S SCHEME TO MISAPPROPRIATE THE VALUE OF USF/JWI'S
## TRADEMARKS, TRADE SECRETS AND OTHER PROPRIETARY INFORMATION

56.     During 2003 and possibly beginning as early as late 2002, Gethin devised and carried out an unlawful scheme (the "Scheme") to misappropriate the value of USF/JWI's Trademarks and its trade secrets and other proprietary information for himself and Defendant J-Parts, L.L.C., a limited liability company that Gethin formed to facilitate the Scheme. The Scheme was carried out by Gethin in combination with Defendant J-Parts, L.L.C. The overt acts performed by one or more of the Defendants in furtherance of the Scheme included the following.

57.     On April 10, 2003, while still serving as USF/JWI's Customer Service Representative for spare parts (a position in which he necessarily was entrusted with regular and continuing access to USF/JWI's trade secrets and other confidential information), Gethin incorporated a limited liability company bearing the name "J-Parts," a name that Gethin knew was associated with USF/JWI's products and that his employer had been considering for use in selling its spare parts. On the same day Gethin caused J-Parts, L.L.C. to adopt the assumed name "J-Parts."

58.     Gethin also downloaded or arranged for the downloading to computer disks of large quantities of USF/JWI Proprietary Information. Gethin had no legitimate business need to download such information in this manner. The USF/JWI Proprietary Information that Gethin caused to be downloaded included the following:

      a.     Key contact and equipment information from the serial history for all 7600 J-Press filter presses and 800 J-Mate dryers in the field;

      b.     A listing of all spare parts sold by USF/JWI, sorted by gross margin;

14

    c.    A listing of customer data (*i.e.*, each customer name and address, contact person's name, telephone number and e-mail address) for all reseller customers, which are the accounts most likely to generate multiple or repeat sales and higher volume sales;

    d.    Copies of numerous proposals made to customers for USF/JWI spare parts sales;

    e.    Many templates that USF/JWI uses for the form of its communications to customers; and

    f.    Detailed USF/JWI spare parts price lists with per part margin in information.

59.    Upon information and belief, as part of the Scheme, Gethin secretly removed all of the above-described USF/JWI Proprietary Information from USF/JWI's offices prior to July 10, 2003.

60.    On July 10, 2003, Gethin tendered his resignation to his supervisor at USF/JWI. When asked by supervisory personnel where he intended to work in the future, Gethin refused to provide the requested information. Because Gethin's refusal to identify his new employer signaled that he intended to work for a competitor, USF/JWI advised Gethin to leave immediately and promptly escorted him from the premises. Tellingly, Gethin neither required nor even asked for any time to pack anything prior to departing.

61.    Examination of the documents and records that Gethin left in his work area at USF/JWI did not reveal any of the disks containing the downloaded data described above.

62.    At least since Gethin's resignation from USF/JWI, Defendants have been competing directly against USF/JWI in the business of selling spare parts for J-PRESS® filter presses, J-MATE® dryers, and other dewatering equipment produced by USF/JWI.

63.     Upon information and belief Defendants are unlawfully using USF/JWI Proprietary Information, including trade secrets, and records, papers, drawings, pictures, computer information, and other tangible documentation containing such information, to compete against USF/JWI for spare parts sales. Indeed, given the nature of Defendants' competitive activity and the information they possess, it is inevitable that such use and the disclosure inherent therein are occurring.

64.     Despite USF/JWI's continuous and exclusive use of its Trademarks, and despite USF/JWI's well-known prior rights in its Trademarks, Defendants adopted colorable imitations of the Trademarks and used said colorable imitations on or in connection with competing goods and/or services. In particular, Defendants have adopted the designation "J-Parts" and have used this designation on or in connection with the sale of dewatering products for use in waste water treatment and disposal. See Exhibit E.

65.     On information and belief, Defendants have represented that they are in some way affiliated, connected or associated with USF/JWI or that Defendants' services originate from or are sponsored or approved by USF/JWI.

66.     An example of the conduct described in the preceding paragraphs is afforded by the introductory electronic mail message Gethin sent to many of USF/JWI's current and long-standing customers on behalf of Defendant J-Parts, L.L.C. (upon information and belief, through the use of customer lists he purloined from USF/JWI). Rather than truthfully stating that there was no connection whatsoever between Defendants and USF/JWI Gethin, who had been USF/JWI's spare parts Customer Service Representative for many years, cleverly delivered the opposite message by telling the customers (in conjunction with using the misleading "J-Parts" name) to "update" their records with the J-PARTS, LLC name "as your preferred supplier of

spare parts, upgrades, rebuilds and retrofits for Water & Wastewater equipment." See Exhibit E. Despite the fact that Gethin only recently created J-Parts, Gethin's email message proclaims that "The J-PARTS team offers world-class service, experience, expertise and great pricing." *Id.*

67.     Several USF/JWI customers to whom Gethin sent the email have contacted USF/JWI to inquire whether J-Parts is affiliated with USF/JWI.

68.     On information and belief, Defendants' use of a colorable imitation of USF/JWI's Trademarks is part of a deliberate plan to trade on USF/JWI's goodwill and to otherwise unfairly compete with USF/JWI and benefit therefrom.

69.     On information and belief, Defendants are acting with full knowledge of USF/JWI's prior rights in the Trademarks and are willfully infringing USF/JWI's Trademarks.

70.     Defendants' wrongful acts have caused and are causing irreparable injury and damage to USF/JWI and, unless this Court restrains Defendants from further commission of these acts, USF/JWI will suffer further irreparable injury for which USF/JWI has no adequate remedy at law.

## COUNT I — FALSE DESIGNATION OF ORIGIN UNDER
### 15 U.S.C. §1125(A)(1)

71.     USF/JWI incorporates by reference the preceding allegations as if fully stated herein.

72.     USF/JWI is the owner of all right, title, and interest in the Trademarks J-PRESS®, J-MATE®, and J-VAP®.

73.     On information and belief, Defendants have used and currently are using the designation "J-Parts" in commerce on or in connection with the sale of dewatering products for use in waste water treatment and disposal.  Such use is without the consent of USF/JWI.

74.     Defendants' use of the designation "J-Parts" is likely to cause confusion, mistake, or deception as to:

    a.     Defendants' affiliation, connection, or association with USF/JWI; and

    b.     the origin, sponsorship, or approval of Defendants' products, services, or commercial activities by USF/JWI.

75.     Defendants' use of the designation "J-Parts" misrepresents the nature, characteristics, and/or qualities of Defendants' commercial activities.

76.     USF/JWI has been damaged by Defendants' use of the designation "J-Parts" and is likely to be further damaged by Defendants' continued use of this designation.  In particular, Defendants' use of this designation, including the prefix "J-", is likely to cause USF/JWI's Trademarks to lose their significance as an indicator of origin.

77.     Upon information and belief, Defendants' acts of trademark infringement and unfair competition alleged above have been committed with the intent to cause confusion, mistake, and to deceive.

**COUNT II — TRADEMARK DILUTION UNDER 15 U.S.C. § 1125(C)**

78.     USF/JWI incorporates by reference the preceding allegations as if fully stated herein.

79.     USF/JWI is the owner of all right, title, and interest in the Trademarks.  USF/JWI is also the owner of U.S. Trademark Registration No. 1,259,184 for J-PRESS®, U.S. Trademark Registration No. 1,384,160 for J-MATE®, and U.S. Trademark Registration No. 2,114,763 for J-VAP®.  The registrations remain valid, subsisting and uncancelled and, per 15 U.S.C. § 1115(a), are evidence of USF/JWI's ownership of and exclusive right to use the Trademarks in commerce.

80. The Trademarks are distinctive, have been used extensively for years, have been heavily promoted, and are highly recognized. Each of the Trademarks is a "famous" mark.

81. After the Trademarks became famous, Defendants began using the designation "J-PARTS" in commerce for commercial gain.

82. Defendants' use of "J-Parts" dilutes the distinctive quality of the Trademarks in violation of 15 U.S.C. § 1125(c).

83. Upon information and belief, Defendants committed these acts willfully and with the intent to trade on the reputation of USF/JWI and to cause dilution of USF/JWI's famous marks.

84. As a result of Defendants' wrongful conduct, USF/JWI has suffered injuries, both compensable and irreparable.

**COUNT III — TRADEMARK INFRINGEMENT UNDER 15 U.S.C. § 1114**

85. USF/JWI incorporates by reference the preceding allegations as if fully stated herein.

86. USF/JWI is the owner of all right, title, and interest in and to the Trademarks.

87. USF/JWI is also the owner of U.S. Trademark Registration No. 1,259,184 for J-PRESS®, U.S. Trademark Registration No. 1,384,160 for J-MATE®, and U.S. Trademark Registration No. 2,114,763 for J-VAP®. Theses registrations remain valid, subsisting and uncancelled and, per 15 U.S.C. § 1115(a), are evidence of USF/JWI's ownership of and exclusive right to use the Trademarks in commerce.

88. On information and belief, Defendants have used and currently are using the designation "J-Parts" in commerce on or in connection with the sale, offering for sale, distribution or advertising of dewatering products for use in waste water treatment and disposal.

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

89.     Defendants have applied the designation "J-Parts" to advertising materials intended to be used in commerce on or in connection with the sale, offering for sale, distribution, or advertising of dewatering products for use in waste water treatment and disposal.

90.     Defendants' use of the designation "J-Parts" is likely to cause confusion, mistake, or deception as to

   a.     Defendants' affiliation, connection, or association with USF/JWI; and

   b.     the origin, sponsorship, or approval of Defendants' products, services, or commercial activities by USF/JWI.

91.     USF/JWI has been damaged by Defendants' use of the designation "J-Parts" and is likely to be further damaged by Defendants' continued use of this designation.  In particular, Defendants' use of the "J-Parts" designation is likely to cause USF/JWI's Trademarks to lose their significance as an indicator of origin.

92.     Upon information and belief, Defendants adopted and first used colorable imitations of, and designations substantially identical to, USF/JWI's Trademarks with full knowledge of USF/JWI's rights.  Therefore, Defendants have willfully infringed such rights.

## COUNT IV — COMMON LAW UNFAIR COMPETITION

93.     USF/JWI incorporates by reference the preceding allegations as if fully stated herein.

94.     By its aforesaid conduct, Defendants have gained an unfair competitive edge by misappropriating the valuable goodwill of USF/JWI's Trademarks.

95.     Upon information and belief, Defendants have used this competitive edge to sell goods and/or services in competition with USF/JWI.  Therefore, Defendants are competing unfairly and have computers unfairly with USF/JWI under the laws of Michigan and other states.

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

## COUNT V-- UNJUST ENRICHMENT

96.     USF/JWI incorporates by reference the preceding allegations as if fully stated herein.

97.     By its aforesaid conduct, Defendants have received a benefit by avoiding the labor and expense of independently developing a source designating mark and the goodwill associated therewith.

98.     Upon information and belief, Defendants have further benefited by selling products and services they would not otherwise have been able to sell.  These benefits have come at the expense of USF/JWI and it would be inequitable for Defendants to retain the benefits.

99.     Defendants have been unjustly enriched by the above-stated facts.

## COUNT VI -- MISAPPROPRIATION OF TRADE SECRETS AND OTHER PROPRIETARY AND CONFIDENTIAL INFORMATION

100.    USF/JWI incorporates by reference the preceding allegations as if fully stated herein.

101.    Defendants obtained access to the USF/JWI Proprietary Information through Gethin's employment relationship with USF/JWI and due to reliance by USF/JWI on Gethin's contractual promises and fiduciary duties to USF/JWI

102.    The USF/JWI Proprietary Information constitutes and/or includes trade secrets as defined by the Michigan Uniform Trade Secrets Act, MCL § 445.1901 et seq ("the MUTSA") and Michigan common law.

103.    Gethin owes USF/JWI a duty pursuant to the MUTSA and the common law of Michigan to neither use nor disclose the USF/JWI Proprietary Information acquired in the course of his employment at USF/JWI for the benefit of anyone other than USF/JWI.

104. Defendants' knew or had reason to know that the USF/JWI Proprietary Information constitutes and/or includes trade secrets.

105. Upon information and belief, Defendants in part used improper means to obtain USF/JWI Proprietary Information.

106. Upon information and belief, Defendants actually and inevitably have disclosed and used for themselves and are disclosing and using for themselves, the USF/JWI Proprietary Information in connection with the competitive activities of J-Parts. Absent a temporary restraining order and preliminary and permanent injunctions prohibiting such action, Defendants will continue to disclose and use the USF/JWI Proprietary Information for the benefit of themselves.

107. USF/JWI is entitled to an injunction preventing the continued actual or threatened misappropriation, use and disclosure of the USF/JWI Proprietary Information. MCL § 445.1903.

108. USF/JWI also is entitled to an injunction which prevents Gethin from working on projects for actual or prospective USF/JWI Customers to eliminate the commercial advantage inevitably derived by J-Parts and Gethin from the USF/JWI Proprietary Information. *Id.*

109. Because of the inevitability of Defendants' use and disclosure of the USF/JWI Proprietary Information in his position at J-Parts, L.L.C., an injunction that merely prohibits Gethin from using the USF/JWI Proprietary Information or prevent them from being involved with USF/JWI Customers will be insufficient to protect USF/JWI against irreparable harm from improper use of the USF/JWI Proprietary Information. An injunction prohibiting Gethin from serving J-Parts in any sales, marketing and for application development position for J-Parts in United States and/or Canada is necessary to prevent irreparable harm to USF/JWI.

110.    Defendants' unauthorized use of the USF/JWI Proprietary Information has caused and will continue to cause irreparable injury and damage to USF/JWI.  USF/JWI has no adequate remedy at law and the balance of interests and the public interest favor granting USF/JWI the injunctive relief it seeks.

111.    The damage to USF/JWI resulting from Defendants' misappropriation of its trade secrets and other proprietary and confidential information will be difficult to quantify and, in all likelihood, will be impossible to quantify with precision.  Such damages include, at a minimum (a) the competitive advantages wrongfully taken from USF/JWI and imparted to Defendants; (b) future lost sales and/or other business opportunities; (c) future lost profits; and (d) loss of reputation, goodwill, and customer relationships.

### COUNT VII -- BREACH OF FIDUCIARY DUTIES AGAINST GETHIN

112.    Plaintiff incorporates by reference the preceding allegations as if fully stated herein.

113.    As a USF/JWI employee, Gethin owed USF/JWI fiduciary duties of loyalty, confidentiality, and other fiduciary duties, including but not limited to:

(i)      the duty of loyalty and good faith;

(ii)     the duty to protect and maintain the confidentiality of USF/JWI Proprietary Information;

(iii)    the duty to pursue the sales and marketing opportunities of USF/JWI solely for and on behalf of USF/JWI;

(iv)     the duty not to use the corporate opportunities and good will of USF/JWI for the benefit of himself or third parties;

(v)      the duty not to plan or operate a competing business or enterprise or act secretly on his own behalf or on behalf of a USF/JWI competitor while still

23

employed by USF/JWI;

(vi)    the duty not to use the confidential and proprietary information of USF/JWI for the benefit of himself or any third party; and

(vii)   the duty not to solicit the existing and prospective customers of USF/JWI for the benefit of himself or third parties.

114.   Gethin, while still a USF/JWI employee, began, on behalf of himself and J-Parts, to use confidential and proprietary trade secrets and information from USF/JWI and/or USF/JWI Customers for the purpose of furthering the business interests of himself and J-Parts.  In doing so, Gethin violated the aforementioned fiduciary duties which he owed and continues to owe to USF/JWI.

115.   On information and belief, Gethin has converted or caused others to convert the USF/JWI Proprietary Information for his own use and for the use of J-Parts.

116.   Gethin has solicited the existing and potential customers of USF/JWI for or on behalf of J-Parts.

117.   Gethin's breaches of his fiduciary duties to USF/JWI have caused and continue to cause irreparable injury and damages to USF/JWI.  USF/JWI has no adequate remedy at law for such breaches of duty and the balance of interests and the public interest favor granting USF/JWI the injunctive relief it seeks.

118.   As a result of Gethin's breaches, USF/JWI has been or will continue to be damaged in the form of lost customers, loss of trade secrets, loss of revenue, loss of confidential financial information and other immeasurable and difficult to quantify damages.  Such damages include, at a minimum (a) the loss of confidentiality regarding USF/JWI Proprietary Information;

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

(b) the competitive advantages wrongfully imparted to J-Parts; (c) future lost sales and/or other business opportunities; (d) future lost profits; and (e) loss of reputation and goodwill.

### COUNT VIII -- BREACH OF CONTRACT AGAINST GETHIN

119.    Plaintiff incorporates by reference the preceding allegations as if fully stated herein.

120.    In Gethin's Employment Agreement, Gethin promised to maintain the confidentiality of USF/JWI Proprietary Information and to return any and all embodiments of the USF/JWI Proprietary Information to USF/JWI upon termination of his employment.

121.    Gethin received valuable consideration for his promises to maintain the confidentiality of the USF/JWI Proprietary Information.

122.    USF/JWI relied on Gethin's promises in continuing Gethin's USF/JWI employment and in trusting Gethin with the USF/JWI Proprietary Information.

123.    Gethin materially breached Gethin's Employment Agreement by taking the USF/JWI Proprietary Information with him to use that information on Defendants' behalf in competing against USF/JWI.

124.    Gethin's breaches of contract have caused and continue to cause irreparable injury and damages to USF/JWI.  USF/JWI has no adequate remedy at law for such breaches of contract and the balance of interests and the public interest favor granting USF/JWI the injunctive relief it seeks.  In addition, the property involved in Gethin's breaches of the Gethin Employment Agreement is unique property.

125.    USF/JWI has suffered damages as a result of Gethin's breaches of contract.  The damages are difficult to quantify but include, at a minimum, (a) the loss of confidentiality regarding USF/JWI Client information; (b) the competitive advantages wrongfully imparted to

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

Gethin and J-Parts; (c) future lost sales and/or other business opportunities; (d) future lost profits; and (e) loss of reputation and goodwill.

**COUNT IX -- UNFAIR COMPETITION**

126.  Plaintiff incorporates by reference the preceding allegations as if fully stated herein.

127.  Gethin has obtained for J-Parts and himself an unfair competitive advantage over USF/JWI through the misappropriation of the USF/JWI Proprietary Information.

128.  On information and belief, Gethin will unfairly and inevitably use, disclose and/or otherwise exploit the USF/JWI Proprietary Information in the course of his and J-Parts' direct competition with USF/JWI.

129.  Gethin's breaches of his duties to USF/JWI and related acts of unfair competition have caused and continue to cause irreparable injury and damages to USF/JWI.  USF/JWI has no adequate remedy at law for such breaches of duty and related acts of unfair competition and the balance of interests and the public interest favor granting USF/JWI the injunctive relief it seeks.

130.  As a result of Gethin's conduct, USF/JWI has been and will be damaged in the form of lost customers, lost revenue, loss of good will, and other immeasurable, unquantifiable, and irreparable injuries caused by Gethin's unfair trade practices.

**COUNT X -- CLAIM AND DELIVERY**

131.  Plaintiff incorporates by reference the preceding allegations as if fully stated herein.

132.  Defendants have willfully and wrongfully obtained and detained USF/JWI electronic and paper documents and materials in which USF/JWI has a possessory interest and has failed to return them to USF/JWI.

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

133. Such materials constitute unique property that is in the possession of or under the control of Defendants.

134. As a direct and proximate result of Defendants' wrongful detention, USF/JWI has suffered damages and continues to suffer damages as a result of Defendants' improper and wrongful detention.

## COUNT XI -- CONVERSION

135. Plaintiff incorporates by reference the preceding allegations as if fully stated herein.

136. Defendants have willfully and wrongfully detained and retained USF/JWI electronic and paper documents and materials and has failed to return them to USF/JWI.

137. By willfully detaining and retaining of USF/JWI electronic and paper documents and materials that constitute unique property, Defendants have converted such unique property to their own use and purposes.

138. As a direct and proximate result of Defendants' wrongful conversion, USF/JWI has suffered damages.

139. Pursuant to MCL § 600.2919a, Defendants are liable for conversion.

## RELIEF REQUESTED

WHEREFORE, USF/JWI respectfully asks that this Court enter one or more orders and judgments granting the following relief:

      a.     A declaratory judgment that USF/JWI's rights in and to the Trademarks are valid, enforceable and have been willfully infringed by Gethin and J-Parts, L.L.C.;

      b.     A temporary restraining order and preliminary and permanent injunctions binding on Gethin, J-Parts, L.L.C., and their principals, agents, servants, employees, attorneys, successors and assigns, and any person(s) acting in concert or participation

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

with any of them, enjoining and restraining them from using USF/JWI's Trademarks or colorable imitations thereof and other designs, designations and indicia which are likely to cause confusion, mistake or deception with respect to USF/JWI's rights, including the names "J-Parts" or any other name incorporating the prefix "J-"; or otherwise infringing USF/JWI's rights in its Trademarks and competing unfairly with USF/JWI;

  c.  An order requiring Gethin and J-Parts, L.L.C. to deliver for impoundment during the pendency of this action, and for destruction upon entry of judgment, all infringing articles;

  d.  A declaratory judgment that Gethin's Confidentiality and Development Agreement is valid and enforceable, and that Gethin has materially breached such agreement;

  e.  A temporary restraining order and preliminary and permanent injunctions binding on Gethin, J-Parts, L.L.C., and their principals, agents, servants, employees, attorneys, successors and assigns, and any person(s) acting in concert or participation with any of them:

  (i)  Ordering the immediate return to USF/JWI of all USF/JWI electronic and paper documents and materials;

  (ii)  Prohibiting the disclosure, dissemination or use of any USF/JWI Proprietary Information;

  (iii)  Prohibiting the erasure or destruction of evidence which may be relevant to this suit including, but not limited to, USF/JWI electronic and paper documents and materials in the possession of Gethin and/or J-Parts, L.L.C.;

  (iv)  Prohibiting the direct or indirect solicitation or acceptance of any

28

business from any of USF/JWI's existing customers and prospective customers that were being actively sought by USF/JWI as of August 2002;

    f.    An order directing J-Parts, L.L.C. and Gethin to file with this Court, and serve on USF/JWI within thirty (30) days after the service of any preliminary or permanent injunction, a written report under oath setting forth in detail the manner and form in which J-Parts, L.L.C. and Gethin have complied with the injunction;

    g.    A constructive trust for the benefit of USF/JWI over all profits, proceeds, payments, revenues, considerations, advantages, or any other remuneration or benefit received by Gethin, J-Parts, L.L.C., or any person or entity acting in concert with them and derived, in whole or in part, directly or indirectly, from their wrongful conduct;

    h.    Compensatory, Exemplary and Punitive Damages in an amount to be determined at trial, including treble damages as appropriate;

    i.    An award to USF/JWI of its costs of suit, including attorneys fees, together with pre-judgment and post-judgment interest as allowed by law; and

    j.    Such other and further relief as the Court deems just and appropriate.

The undersigned hereby consents to electronic service in the above-captioned matter.

DYKEMA GOSSETT PLLC

By: _Lori M. Silsbury_

Robert J. Franzinger (P25539)
Lori M. Silsbury (P39501)
Thomas M. Schehr (P54391)
Adam B. Strauss (P53319)
Attorneys for Plaintiff
400 Renaissance Center
Detroit, Michigan 48243-1668
(313) 568-6690

Dated: August 29, 2003